UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JAMES MCADAMS and JO ANN MCADAMS,

Plaintiffs,

v.

Case No. 18-cv-2199-JPG

SHINDONG INDUSTRIAL CO. LTD.,

Defendant.

**MEMORANDUM AND ORDER**

This matter comes before the Court on the amended motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) filed by defendant Shindong Industrial Co. Ltd. ("Shindong") (Doc. 28). Shindong, a South Korean corporation with its principle place of business in South Korea, argues that it is not subject to the Court's jurisdiction. Plaintiffs James McAdams ("McAdams") and Jo Ann McAdams have responded to the motion (Doc. 41), and Shindong has replied to that response (Doc. 42). Following limited jurisdictional discovery, the plaintiffs filed a supplemental response (Doc. 47), to which Shindong has replied (Doc. 48).

**I.  Background**

This case arose after McAdams was injured on August 18, 2016, while working on a tractor owned by his employer Krause and Son, Inc., doing business as Prairie Land Power ("Prairie Land Power"). Prairie Land Power was an authorized dealer of Kioti brand tractors. McAdams, a sales manager, was preparing a Kioti tractor (from Kioti's CK10 series) that had a front-end loader (model KL4010) fitted with a quick attach plate. The quick attach plate was used to secure various universal skid-steer attachments to the loader. The tractor McAdams was preparing had a grapple attachment attached to the front-end loader's hydraulic arms using the quick attach plate. McAdams noticed the grapple was not working properly, so he attempted to

fix it by raising the front-end loader arms. When the hydraulic arms were fully extended, the grapple detached from the quick attach plate and fell on McAdams. He was severely injured.

In December 2017, in the Circuit Court for the Seventh Judicial Circuit, Jersey County, Illinois, the plaintiffs sued a number of parties potentially responsible for McAdams's injuries, including Daedong-USA d/b/a Kioti Tractor Division, the seller of the tractor and a subsidiary of Daedong Industrial Company Ltd. ("Daedong Industrial"), and Worksaver Inc., the manufacturer of the grapple attachment. In August 2018, McAdams first learned through discovery that Daedong Industrial manufactured the tractor and that Shindong manufactured the front-end loader and the quick attach plate. The plaintiffs then filed two new suits in Jersey County against Shindong and Daedong Industrial, respectively. Shindong removed its case to this Court as this case, Case No. 18-cv-2199-JPG-RJD, and Daedong Industrial removed its case as Case No. 18-cv-2194-JPG-RJD.

Shindong believes this Court does not have personal jurisdiction to adjudicate the plaintiffs' claims against it and has, accordingly, moved to dismiss this case for lack of personal jurisdiction.. The plaintiffs contend Shindong's contacts with Illinois are sufficient to provide the basis for personal jurisdiction.

## II. Analysis

### A. Personal Jurisdiction

When personal jurisdiction is challenged under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing personal jurisdiction over a defendant. *Matlin v. Spin Master Corp.*, 921 F.3d 701, 705 (7th Cir. 2019); *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). If there are material facts in dispute regarding the Court's jurisdiction over a defendant, the Court must hold an evidentiary hearing at

2

which the plaintiff must establish jurisdiction by a preponderance of the evidence. *Purdue Research*, 338 F.3d at 782 (citing *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002)). Alternatively, the Court may decide the motion to dismiss without a hearing based on the submitted written materials so long as it resolves all factual disputes in the plaintiff's favor. *Purdue Research*, 338 F.3d at 782 (citing *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997)); *see uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 423-24 (7th Cir. 2010). If the Court consults only the written materials, the plaintiff need only make a *prima facie* showing of personal jurisdiction. *Matlin*, 921 F.3d at 701; *Purdue Research*, 338 F.3d at 782 (citing *Hyatt*, 302 F.3d at 713).

A federal court sitting in diversity, as this Court is, looks to the personal jurisdiction law of the state in which the court sits to determine if it has jurisdiction. *Hyatt*, 302 F.3d at 713 (citing *Dehmlow v. Austin Fireworks*, 963 F.2d 941, 945 (7th Cir. 1992)). Thus, this Court applies Illinois law. Under Illinois law, a court has personal jurisdiction over a defendant if an Illinois statute grants personal jurisdiction and if the exercise of personal jurisdiction is permissible under the Illinois and United States constitutions. *RAR,* 107 F.3d at 1276; *Wilson v. Humphreys (Cayman), Ltd.*, 916 F.2d 1239 (7th Cir. 1990).

        1.      <u>Illinois Statutory Law</u>

Under Illinois law, the long-arm statute permits personal jurisdiction over a party to the extent allowed under the due process provisions of the Illinois and United States constitutions. 735 ILCS 5/2-209(c); *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 714 (7th Cir. 2002); *C. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 940 (7th Cir. 2000). Therefore, whether the Court has jurisdiction over a defendant depends on whether such jurisdiction is permitted by federal and state constitutional standards.

3

2. <u>Illinois Constitutional Law</u>

The Illinois Constitution's due process guarantee, Ill. Const. art. I, § 2, permits the assertion of personal jurisdiction "when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Rollins v. Ellwood*, 565 N.E.2d 1302, 1316 (Ill. 1990). When interpreting these principles, a court may look to the construction and application of the federal due process clause. *Id*. In fact, the Seventh Circuit Court of Appeals has suggested that there is no operative difference between Illinois and federal due process limits on the exercise of personal jurisdiction. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 715 (7th Cir. 2002) (citing *RAR, Inc. v. Turner Diesel Ltd.,* 107 F.3d 1272, 1276 (7th Cir. 1997)). The Court sees nothing in this case indicating that in this particular situation the federal and state standards should yield a different result. Therefore, if the contacts between the defendant and Illinois are sufficient to satisfy the requirements of federal due process, then the requirements of both the Illinois long-arm statute and the Illinois Constitution have also been met, and no other inquiry is necessary.

3. <u>Federal Constitutional Law</u>

The Due Process Clause of the Fourteenth Amendment limits when a state may assert personal jurisdiction over nonresident individuals and corporations. *See Pennoyer v. Neff*, 95 U.S. 714, 733 (1877), *overruled on other grounds by Shaffer v. Heitner*, 433 U.S. 186 (1977). Under federal due process standards, a court can have personal jurisdiction over a defendant only if the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463

(1940)).  The defendant must have "purposely established minimum contacts with the forum state such that he or she 'should reasonably anticipate being haled into court' there." *Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474 (1985)).

What this standard means in a particular case depends on whether the plaintiff asserts "general" or "specific" jurisdiction.  Specific, or case-linked, jurisdiction refers to jurisdiction over a defendant in a suit arising out of or in connection with the defendant's purposeful contacts with the forum.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923-24 (2011); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 nn. 8, 9 (1984). General, or all-purpose, jurisdiction, on the other hand, may exist even in suits that do not arise out of or relate to the defendant's contacts so long as the defendant has "continuous and systematic" contacts with the forum state.  *Goodyear*, 564 U.S. at 924; *Helicopteros Nacionales*, 466 U.S. at 416.  No party in this case contends the Court has general jurisdiction over Shindong; the issue is whether specific jurisdiction exists.

The specific jurisdiction inquiry "focuses on the relationship among the defendant, the forum, and the litigation."  *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (internal quotations omitted).  First, there must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  *Hanson v. Denckla,* 357 U.S. 235, 253 (1958); *accord Goodyear*, 564 U.S. at 924.  Second, the lawsuit must arise out of or be related to the defendant's contacts with the forum.  *Goodyear*, 564 U.S. at 923-24; *Helicopteros Nacionales*, 466 U.S. at 414 n. 8.

Whether a products liability defendant has purposefully availed itself of privileges in a particular state by placing its products into the "stream of commerce"—that is, the path from

5

manufacturer to distributor to customer—is a subject of debate. In *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980), the Supreme Court considered whether an Oklahoma court had personal jurisdiction over a New York car distributor and dealership that had sold a car to a New York resident who then took the car to Oklahoma and was involved in an accident there. *Id.* at 288. The Court noted that the car distributor and dealership directed their business activities only in New York and/or New Jersey and Connecticut and had no connection to Oklahoma other than that they distributed or sold the car that happened to be involved in an accident there. *Id.* at 288-89, 295. In finding no personal jurisdiction, a majority of the Supreme Court held that a defendant's "deliver[ing] its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State" subjects it to the personal jurisdiction of that state. *Id.* at 298. On the other hand, as was the situation in the case before it, the Court held the forum state's court does not have personal jurisdiction over a defendant that sells a product to a consumer who then unilaterally moves the product into the forum state without the defendant's expecting it to be so moved. *Id.*

In *Asahi Metal Industry Co. v. Superior Court of California, Solano County*, 480 U.S. 102 (1987), the Supreme Court could not agree whether a California court had personal jurisdiction over a Japanese defendant simply because it placed its product into the stream of commerce knowing and expecting it would end up in the forum state. Four justices agreed that it was enough that a defendant who placed its product into the stream of commerce *knew* the product, "in the regular and anticipated flow of products," would be marketed and regularly sold in the forum state. *Id.* at 117 (Brennan, J., concurring). Having derived benefits from having its product sold in the forum, the manufacturer could predict and should not be surprised that it could be sued there as well. *Id.* Four other justices required more than a defendant's

6

awareness that its product would enter the forum state through the regular course of business to establish "purposeful availment." *Id.* at 112 (O'Connor, J.). They required "something more," that is, that the defendant purposefully direct its business activities to the forum state by, for example, "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.* The ninth justice would look to the volume of sales of the defendant's product made in the forum to determine whether the defendant "purposefully availed" itself of the forum's benefits. *Id.* at 122 (Stevens, J., concurring). Despite their various views of the stream of commerce theory, all of the justices agreed in the judgment that personal jurisdiction did not exist. *Id.* at 108.

More recently, the Supreme Court decided *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011). In that case, a British manufacturer of scrap metal machines had agreed with an independent distributor to sell its machines in the United States, but it did nothing to target the New Jersey market. *Id.* at 878, 886 (Kennedy, J., plurality). The distributor ended up selling no more than four machines, and possibly only one, in the state of New Jersey. *Id.* Four justices rejected the approach requiring only the awareness and expectation that a product would be sold in a particular state, and instead approved of the approach requiring purposeful targeting of business activities to the forum in addition to foreseeability of sales in the forum. *Id.* at 885-86. Two more justices found the plaintiff had not satisfied the tests articulated in *Asahi* and *World-Wide Volkswagen* where there was only a single sale of the offending product in the forum by an independent distributor. *Id.* at 889 (Breyer, J., concurring). In his concurrence, the narrowest articulation of the basis for the judgment, Justice Breyer rejected the extremes:

7

(1) the absolute rule of Justice Kennedy's plurality requiring business activities targeting the specific forum and (2) the notion that mere awareness that a single product *might* be sold through a national distribution network in a distant forum—however unlikely, irregular or inconvenient—as sufficient to support personal jurisdiction under a stream of commerce theory. *Id.* at 890-91. Instead, he suggested the due process analysis should continue to focus on fairness in light of the relationship between the defendant and the forum as well as business realities such as the characteristics of the manufacturer and other "contemporary commercial circumstances." *Id.* at 892-93. The final three justices thought it imminently fair to exercise personal jurisdiction over a foreign manufacturing defendant in a state where its product caused an injury and where the defendant indiscriminately aimed to distribute its products across the entire country. *Id.* at 905 (Ginsberg, J., dissenting).

The Seventh Circuit Court of Appeals has acknowledged the open question regarding the appropriate stringency of the stream of commerce theory, that is, whether it requires only awareness and expectation that a manufacturer's product will be marketed and regularly sold in a certain market, whether the manufacturer must also have purposefully directed business activities to that market, or some middle ground. *Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 550 (7th Cir. 2004); *see N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 492 (7th Cir. 2014). The Court of Appeals noted before *J. McIntyre* that a majority of the Supreme Court had never overruled the less stringent expectation test articulated in *World-Wide Volkswagen*. *Dehmlow v. Austin Fireworks*, 963 F.2d 941, 947 (7th Cir. 1992). A majority of justices in *J. McIntyre*, in turn, agreed that the broadest view of the stream of commerce theory—awareness that a single product might be sold in a specific forum—does not apply, but they did not agree that the targeting rule does either. Instead, the focus should be on overall fairness considering the characteristics of

8

the manufacturer and other "contemporary commercial circumstances." *J. McIntyre*, 564 U.S. at 892-93.

Even where there are sufficient minimum contacts, a defendant may still show that the exercise of jurisdiction would be unfair or unreasonable in light of such factors as "the burden on the defendant. . .[;] the forum State's interest in adjudicating the dispute . . . ; the plaintiff's interest in obtaining convenient and effective relief . . .; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies." *World-Wide Volkswagen*, 444 U.S. at 292; *accord Asahi Metal*, 480 U.S. at 113; *Burger King*, 471 U.S. at 477.

B. <u>Application to Shindong</u>

Shindong argues that the plaintiffs have failed to make a *prima facie* showing that the Court has specific jurisdiction over it. It maintains that it did not purposefully direct any commercial activity at Illinois or purposefully avail itself of the privilege of conducting business in Illinois. It argues that *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011), controls this case because, like the manufacturer in that case, Shindong was a foreign company that manufactured products overseas and sold them to an independent distributor in the United States (not in the forum state) for it to further distribute in the United States. It further argues that, even if the broad view of the stream of commerce theory applied—where it is enough to know a product would be regularly distributed in the forum in the regular course of business—there is no evidence Shindong knew its product would end up in Illinois when it was distributed by Daedong-USA.

In support of its arguments, Shindong has submitted an affidavit (Doc. 28-1) from Doughan Lee, the managing director of Shindong. In that affidavit, he makes the following

9

sworn statements. Shindong is a South Korean company with its principal and only place of business in South Korea. It is not a resident of Illinois and does not pay taxes in Illinois. It has no real estate, leased property, office, manufacturing facility, address, telephone number, bank accounts, or assets in Illinois. In fact, it has no office anywhere in the United States. It has no sales agents, employees, officers, or directors who work or reside in Illinois. It does not engage in direct marketing, promotional, advertising or solicitation activities in Illinois and does not engage in sales or service in Illinois. It is not, and has never been, qualified, licensed or authorized to do business in Illinois, and it does not conduct any business or have a registered agent in Illinois. It has never designed any of its products specifically for the Illinois market. Shindong manufactures the Kioti front-end loader and quick attach plate, but it does not manufacture Kioti tractors. It has never marketed the loader or quick attach plate through a distributor in Illinois, and no Illinois distributor has agreed to serve as a sales agent for Shindong. Instead, it sells loaders and quick attach plates to Daedong-USA, the distributor for Kioti tractors, and ships them from South Korea to Daedong-USA's North Carolina facility. Shindong is not responsible for further distribution in the United States beyond that point. It has never created, employed, or controlled a distribution system for its products to reach Illinois.

The plaintiffs argue that under the narrow or the broad stream of commerce theory of specific personal jurisdiction, they have presented sufficient evidence to establish a *prima facie* case for personal jurisdiction based on the connections between Shindong and Illinois. They point to:

    1.    <u>The March 2014 Purchase Agreement ("Agreement") between Shindong and Daedong-USA</u>. Under this agreement, Shindong gave Daedong-USA the right to sell Shindong' products and parts in North and South America. Agreement § 2.1. Shindong agreed to

manufacture its products and parts in accordance with specifications agreed to by Daedong-USA and Shindong and to apply Kioti trademarks as Daedong-USA instructed. Agreement § 5.1. Daedong-USA agreed to be responsible for all after sale service of the products Shindong manufactured and to make its dealer network available to perform that service. Agreement § 2.3. Daedong-USA and Shindong agreed to share customer feedback as necessary to monitor satisfaction and to assist Shindong in developing and manufacturing its products. Agreement § 3.2. Shindong warranted to Daedong-USA that the Shindong products would be free from defects for twelve months from the date of sale to the consumer, and that the warranty covered Daedong-USA's costs of parts and labor to perform the repair. Agreement § 11.2.1. Daedong-USA and Shindong further agreed that certain business information such as, for example, customer lists, customer information, sales information, and marketing information, that either party disclosed would be kept confidential. Agreement § 15.2.

    2. <u>The relationship and course of dealing between Shindong and Daedong-USA</u>. Shindong manufactured the front-end loader model KL4010 and the associated quick attach plates of the type involved in this case and, indeed, manufactured the products involved in this lawsuit. It specifically designed the model KL4010 front-end loader for the Kioti CK10 tractor involved in McAdams's accident. Shindong labeled the products it manufactured and sold to Daedong-USA with Kioti trademarks and shipped them to Daedong-USA in North Carolina for distribution through Daedong-USA's nationwide dealership and distribution network. In 2016, Shindong made 125 shipments of products to Daedong-USA. Daedong-USA was the exclusive distributor for Shindong's products in the United States. Daedong-USA currently has eight authorized dealerships in Illinois. At the time of McAdams's accident, that network included Prairie Land Power. In the approximate year before the accident, Daedong-USA sold 135

KL4010 front-end loaders in Illinois, representing 5% of Daedong-USA's sales of that loader.

Shindong representatives have frequently attended Daedong-USA's annual dealership meetings in the United States at Daedong-USA's request. Daedong-USA's authorized dealers, including those in Illinois, were likely present at those meetings as well, and at least one of those Illinois dealers was recognized for being the top Kioti seller in North America in 2015, 2016 and 2017. At the 2015 annual meeting and possibly others, Shindong representatives helped introduce new products to the Kioti dealerships at the meeting.

In reply, Shindong notes that it attended no Daedong-USA annual meetings in Illinois. Shindong further points to the lack of any evidence that it actually controlled or knew where its products were sold through Daedong-USA's distribution network or that it included Illinois as a potential or actual market. It reiterates that it is a separate company from Daedong Industrial and from Daedong-USA.

Resolving all factual disputes and drawing all reasonable inferences in favor of the plaintiffs, the Court finds that the plaintiffs have not made a *prima facie* showing that the Court has personal jurisdiction over Shindong regardless of which stream-of-commerce theory is applied. Under neither theory does Shindong have sufficient minimum contacts with Illinois for specific jurisdiction purposes.

In the bulk of their argument, the plaintiffs incorrectly focus on Shindong's relationship with Daedong-USA rather than with the state of Illinois. It is undisputed that Shindong had a commercial relationship with Daedong-USA embodied in the Agreement. The Agreement, however, reflects only Shindong's agreement to sell its products to Daedong-USA so that Daedong-USA could distribute them as a component part of Daedong-USA's own tractor package throughout North and South America. The Agreement displays no connection between

Shindong and Illinois, no specific contemplation that Daedong-USA will sell Shindong's products in Illinois, and certainly no indication that Shindong's products would end up in Illinois as part of the regular and anticipated flow of products in the stream of commerce. It is simply an agreement (1) that Shindong would manufacture its products to Daedong-USA's specifications and put the Kioti name on them, (2) that Daedong-USA, an independent distributor, would sell Shindong's products somewhere within two continents, would service the products after selling them (including warranty work) through its authorized dealers (and at Shindong's cost if within a year of the sale to the consumer), and would share customer feedback to help Shindong make better products, and (3) that if either party learned confidential business information from the other, it would keep the information confidential. Such an agreement says nothing about any contact between Shindong and Illinois.

Similarly, Shindong's course of dealing with Daedong-USA reveals no substantial connection with Illinois. Shindong admits it manufactures the front-end loader and quick attach plate to Daedong-USA's specifications—that much is known from the Agreement—but nothing suggests those designs were specifically aimed toward or at the demand of the Illinois market or that, if they were, Shindong even knew that. Although 135 front-end loaders per year of the type at issue in this case were sold in Illinois, there is no suggestion that Shindong was in any way responsible for the selection of the market or for the individual sales or that it even knew the magnitude of sales in Illinois. And while it is possible that Shindong representatives attending Daedong-USA's annual dealership meetings learned that Daedong-USA sold to authorized dealerships in Illinois and that at least one of those dealerships was outstanding at selling *Kioti* products, it is a leap to say that this made Shindong aware that *front-end loaders it manufactured* were sold in substantial numbers in Illinois as part of Daedong-USA's regular flow or regular

13

course of sales. In sum, the evidence cited by the plaintiffs does not show any strong connection between Shindong and Illinois.

The Court turns to application of the relevant law to the foregoing facts. It is impossible not to notice that this case is remarkably similar to *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011): a foreign manufacturer contracted with an independent domestic distributor to sell its products in the United States and directed marketing and sales efforts to the United States generally but did not take any other action *to target the forum state* for sales. *Id.* at 878. However, this case has one distinguishing feature: in *J. McIntyre*, one to four products were sold in the forum through the stream of commerce, *id.*, but in this case, approximately 135 products were sold in Illinois in the stream of commerce in just the year before the accident. Other than that, the cases are nearly identical in all material respects.

Under Justice Kennedy's plurality opinion, such action does not enable the forum state to exercise personal jurisdiction over the foreign manufacturer. That opinion requires more than *awareness* or a *prediction* that goods may end up being sold in the forum state; it requires *targeting the forum state*. *Id.* at 882-83 (rejecting the broad stream of commerce theory). The plaintiffs in this case point to no activity by Shindong targeting Illinois specifically, although it may have targeted North and South America as a whole by selling its products to Daedong-USA to distribute there. Instead, based on the Agreement and the relationship between Shindong and Daedong-USA, it was possible that using Daedong-USA's distribution network could result in products being sold in Illinois.

It is unclear where this case would land under Justice Breyer's concurring opinion, which relies in great part only the low volume of sales in the forum—possibly just one isolated sale. *Id.* at 888. Justice Breyer found the one product was not distributed in the "regular flow" or

"regular course" of sales so as to satisfy even the broad stream of commerce theory. *Id.* at 889. Here, there were 135 sales of Shindong's products in Illinois within about a year, raising the question whether the Shindong products were, in fact, distributed in the regular flow or regular course of Daedong-USA's business. It appears they were. Such substantial sales were clearly part of a business plan, not an "eddy" in the flow of business, as Justice Breyer referred to foreseeable but isolated sales. Nevertheless, those sales were accomplished by an independent distributor over which Shindong had no control, and there is no evidence Shindong knew the flow of business ran strong through Illinois. Without knowledge of the path of the flow, the Court would be hard-pressed to say Shindong purposefully established contacts with the state.

This observation is relevant to the question of whether the plaintiffs have made a prima facie case of personal jurisdiction over Shindong under the broad theory, the one most recently adopted by the Seventh Circuit Court of Appeals in *Dehmlow v. Austin Fireworks*, 963 F.2d 941, 947 (7th Cir. 1992). In other words, did Shindong deliver its front-end loader into the stream of commerce *with the expectation* that it would be sold in Illinois as part of the regular and anticipated flow of products or did its front-end loader end up here because of unilateral action of third party Daedong-USA? As noted above, Shindong knew very little about Daedong-USA's regular and anticipated sales of products—it did not control them, and it did not know anything specific about its distribution networks other than at least one Illinois dealership was very successful selling Kioti tractors. Without knowing more about the flow of Daedong-USA's business, Shindong could not have had any expectation that when it sold its front-end loaders to Daedong-USA, they would be sold in the regular flow of commerce in Illinois. Daedong-USA had exclusive control over the front-end loader distribution, and they did not share their plan or their results with Shindong. On the contrary, the evidence shows Shindong had no more

expectation that Daedong-USA would sell Shindong's front-end loaders in Illinois than the *World Wide Volkswagen* defendants had that one of its cars would be in an accident in Oklahoma. Thus, even under the broad stream of commerce theory, the Court does not have personal jurisdiction over Shindong.[1]

### III. Conclusion

For the foregoing reasons, the Court:

- **GRANTS** Shindong's motion to dismiss for lack of personal jurisdiction (Doc. 28);

- **DISMISSES** this case **without prejudice**;

- **DENIES as moot** the plaintiffs' motion to consolidate this case with *McAdams v. Daedong Industrial Company, Ltd.*, No. 18-cv-2194-JPG-RJD; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATED: November 26, 2019**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

---

[1] This does not leave the plaintiffs without a remedy if Shindong's front-end loader or quick attach plate were to be found defective. Illinois law recognizes the "apparent manufacturer theory." Under that theory, when a business sells a product manufactured by another but erroneously holds itself out to the purchasing public as the products manufacturer by, for example, putting its name on the product, the seller will be liable for a defective product as if it were the manufacturer. *Hebel v. Sherman Equip.*, 442 N.E.2d 199, 201 (Ill. 1982). Additionally, although a distributor may be dismissed from a suit once it identifies the manufacturer of a defectively designed product, 735 ILCS § 5/2-621(b), the dismissal may be vacated if the manufacturer is not subject to personal jurisdiction in Illinois, 735 ILCS § 5/2-621(b)(3). Thus, Daedong-USA may be liable in the companion state court action for a defective product manufactured by Shindong.